IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE CENTER FOR SELF LEADERSHIP, INC. )
d/b/a IFS Institute, )
                                   )
             Plaintiff, )         Case No.   25 C 11339
                                     )
        v. )
                                     )         Judge Robert W. Gettleman
PESI, INC., EVERGREEN CERTIFICATIONS )
LLC, FRANK ANDERSON M.D., and FRANK G. )
ANDERSON M.D., INC., )
                                     )
            Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Center for Self Leadership, Inc. ("plaintiff" or "CSL") has sued defendants

PESI, Inc. and Evergreen Certifications LLC, and defendants Frank Anderson M.D.

("Anderson") and Frank G. Anderson M.D., Inc. ("Anderson, Inc.") (collectively, the

"Andersons") for, among other things, federal trademark infringement and false advertising.

According to plaintiff, it provides training and certification to psychotherapists under the

INTERNAL FAMILY SYSTEMS or IFS brand of psychotherapy, which its founder developed

over 30 years ago.   Plaintiff alleges that it contracted with PESI—a provider of continuing

education—to host plaintiff's online training content under those two trademarks.   But, plaintiff

alleges, PESI conspired with one of plaintiff's lead trainers—psychiatrist Anderson—to create

and host competing IFS-branded content without plaintiff's permission.   And, plaintiff further

alleges, PESI, Dr. Anderson, and PESI's subsidiary (Evergreen) then co-created an infringing

"IFS" certification program.

To stop defendants, plaintiff filed its complaint here, asserting six counts: a claim against

all defendants for federal trademark infringement and unfair competition under the Lanham Act,

15 U.S.C. § 1125(a) (Count I); a claim against all defendants for federal false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count II); a claim against all defendants for violations of the Illinois Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/1 et seq. (Count III); a claim against all defendants for Illinois common law unfair competition (Count IV); a claim against Anderson for a breach of fiduciary duty (Count V); and a claim against PESI for breach of contract (Count VI).

PESI and Evergreen have moved to dismiss Counts I-IV and VI under Fed. R. Civ. P. 12(b)(6). The Andersons have separately moved to dismiss Counts I-V under Rule 12(b)(6). Plaintiff opposes both motions. For the reasons below, the court grants in part and denies in part PESI and Evergreen's motion to dismiss, and grants in part and denies in part the Andersons' motion to dismiss.

## BACKGROUND

Plaintiff alleges the following facts in its complaint, which are taken as true in resolving defendants' motions. Alam v. Miller Brewing Co., 709 F.3d 662, 665-66 (7th Cir. 2013). In the 1980s, Richard Schwartz, PhD, "coined" the terms "INTERNAL FAMILY SYSTEMS" and "IFS" to identify a specific model of "parts work" psychotherapy that he created. "Parts work is the generic term for a form of psychotherapy based on the theory that individuals possess multiple internal parts or subpersonalities (or that it is helpful for individuals to view their own psyche in this way), and that engaging with these 'parts' can help patients address trauma and other psychological conditions." "INTERNAL FAMILY SYSTEMS identifies the specific brand of psychotherapy and the specific training and certification programs developed." Schwartz spent years training and certifying therapists in his IFS Model. Then, in 2000, he

2

founded plaintiff—an Illinois corporation with its principal place of business in Illinois that does business as the "IFS Institute"—which has been the world's only source of authorized training and certification in the IFS Model for the last 25 years.

Indeed, since 2000, plaintiff (and before that, Schwartz) "has hosted the annual IFS Conference focused on the IFS Model, consistently using the IFS and INTERNAL FAMILY SYSTEMS marks to identify itself as the respective sources of the event." Plaintiff has also "been the exclusive provider of training and certification in the IFS Model," and "has officially trained more than 15,000 psychotherapists and other professionals and has delivered introductory and educational programs on the IFS Model's principles, concepts, and methods to tens of thousands more." In 2015, Schwartz and the IFS Model were also "featured in a chapter of [a] New York Times Best Seller, 'The Body Keeps the Score,' which spent more than 344 weeks on the . . . List for paperback nonfiction (27 of those 344 weeks at No. 1)." "As a result of [p]laintiff's continuous and exclusive use of the IFS and INTERNAL FAMILY SYSTEMS trademarks—particularly in connection with its genuine training and certification programs and credentials—professionals . . . associate these marks exclusively with" plaintiff.

In 2008, Massachusetts psychiatrist Anderson enrolled in one of plaintiff's IFS Training programs. Thereafter, in the 2010s, he became one of plaintiff's lead trainers, took over Schwartz's role as lead trainer for "the Trauma and Neuroscience Level 2" training programs, and held "highly visible roles" in "The Foundation for Self Leadership."

Toward the end of that decade, plaintiff became involved with PESI—a corporation with its principal place of business in Wisconsin and "a behemoth in the continuing education industry and the largest online clearinghouse for continuing education for therapists." Plaintiff

3

collaborated with PESI "to market and host [p]laintiff's online seminars and educational content in the IFS brand of psychotherapy." In particular, "[p]laintiff and Dr. Schwartz created the content, while PESI . . . market[ed] it to psychotherapists." "By the start of 2019, Dr. Schwartz had . . . produced several authorized introductory programs with PESI that were marketed under [p]laintiff's brand," and, "with [p]laintiff's authorization, . . . Dr. Anderson had produced several small introductory online offerings under [p]laintiff's brand that were marketed and sold by PESI."

Eventually, in March 2019, plaintiff and PESI executed the "PESI Contract." Under it, PESI would market and host plaintiff's "proprietary branded content, and . . . the parties would work together to produce more authorized online content under [p]laintiff's brand." To that end, "[t]hroughout 2019," "PESI hosted [p]laintiff's existing online content—IFS Online Circle and IFS Continuity—and" worked with plaintiff "to produce new online content under the IFS and INTERNAL FAMILY SYSTEMS marks." The PESI Contract states that "[n]ew online content that needs to be developed for current or future online programming may be developed by [plaintiff] or in partnership with PESI."

At around the same time, plaintiff and Anderson "began negotiating a contract that would significantly expand and define" his role with plaintiff. The two ultimately entered into the "Anderson Contract" in January 2020. "Though the Anderson Contract provided that its term would end on December 31, 2020, the parties continued to work under the contract through 2021, into 2022 and beyond." Indeed, Anderson worked with plaintiff and its outside counsel "on [p]laintiff's trademark and intellectual property matters and legal strategy, including . . . developing drafts of trademark policies, pursuing trademark registrations on INTERNAL

FAMILY SYSTEMS and IFS, and enforcing [p]laintiff's rights against infringers." He also "served as a director-level consultant on an IFS committee focused on preserving the integrity of [p]laintiff's brand."

But by 2023, Anderson had begun conspiring with PESI to develop an unauthorized imitation Certification Program, and the two had "record[ed] and launch[ed] his '*Frank Anderson's INTERNAL FAMILY SYSTEMS Trauma Treatment Program*." (Emphasis in complaint). Then, in 2024, "Anderson notified Dr. Schwartz of his intentions to launch a certification program with PESI [that was] branded under [p]laintiff's brand." Plaintiff responded, informing PESI and Anderson "that they were not authorized to use [p]laintiff's trademarks in connection with any training or certification program that was not affiliated with [p]laintiff."

Thereafter, on April 16, 2025, Anderson "informed [p]laintiff that he would no longer conduct training programs on behalf of [p]laintiff." Yet he and PESI continued to market (on PESI's website) "Anderson and his programs, including [an] unauthorized Certified IFS Trauma Clinician (IFST-C) certification, by falsely stating that he '*__is__ a Lead Trainer at the IFS Institute under Richard Schwartz*,'" which intentionally misled and confused consumers "as to PESI and Anderson's affiliation with [p]laintiff." (Emphasis in complaint).

In June 2025, Evergreen—which, on information and belief, is a wholly owned subsidiary of PESI that is "committed to certifying behavioral health, healthcare, allied health, and education professionals"—"publicly announced the launch of a new certification program titled 'Evergreen Certified IFS Trauma Clinician (IFS-T-C).'" Evergreen displays plaintiff's IFS mark on its website. And on information and belief, PESI, Anderson, and Evergreen co-

5

created Evergreen's infringing IFS trauma certification program. Evergreen's website also "identifies Dr. Anderson as an 'Advisor' to the certification program," and "[a]t the time it was launched, the website falsely claimed: 'Dr. Anderson is the Vice Chair, Director, and trainer for the Center for Self Leadership with Richard Schwartz, PhD.'"

To stop defendants "from continuing their unlawful activities" and "to prevent further harm to [p]laintiff and the public," plaintiff filed this lawsuit in September 2025. "Plaintiff also seeks all damages and other" appropriate relief.

## DISCUSSION

Defendants have moved to dismiss all counts in the complaint under Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) provides for dismissal based on a plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 8 "prescribes the information [that] a plaintiff must present about the merits of his claim at the outset of litigation: 'a short and plain statement of the claim showing that [he] is entitled to relief.'" Berk v. Choy, 146 S. Ct. 546, 553 (2026) (quoting Fed. R. Civ. P. 8(a)(2) (second bracket in original)). So to rule on a Rule 12(b)(6) motion, the court must determine whether the plaintiff has adequately presented a statement of the claim that shows entitlement to relief.

To do so, the court "asks only whether the complaint's factual allegations, if taken as true, 'state a claim to relief that is plausible on its face.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Johnson v. City of Shelby, Miss., 574 U.S. 10, 12 (2014) ("A plaintiff . . . must plead facts sufficient to show that her claim has substantive plausibility."). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

6

alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); see also Johnson, 574 U.S. at 12 ("Petitioners stated simply, concisely, and directly events that, they alleged, entitled them to damages from the city."). "[W]here the well-pleaded facts do not permit the court to infer more than the possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." Iqbal, 556 U.S. at 679 (cleaned up). In other words, a claim for relief "cannot be merely conceivable or speculative." Taylor v. Salvation Army Nat'l Corp., 110 F.4th 1017, 1028 (7th Cir. 2024). Rather, the "plaintiff must present a story that holds together"—with "sufficient details to make the plaintiff['s] account one that *could* have happened and, if it did happen, states a claim cognizable under the governing law." Id. (cleaned up) (emphasis in original).

In determining whether the plaintiff has presented such a story, the court must "understand" the law "on which the claims of the complaint are predicated." Id. This means that the court must review the relevant statutes to see if the plaintiff's story falls within the scope of what those statutes protect and "gives adequate notice" to the defendant "of the gravamen of the plaintiff['s] grievance." Id. At the same time, the court must be mindful that "the Federal Rules of Civil Procedure do not require code pleading"—that is, "plead[ing] the elements of a cause of action along with facts supporting each element." Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana, 786 F.3d 510, 517 (7th Cir. 2015); see also Deslandes v. McDonald's USA, LLC, 81 F.4th 699, 705 (7th Cir. 2023) (a complaint need not "match facts to elements of legal theories").

In the end, the "plausibility" "principle does not, and under the strictures of Rule 8 cannot, present a high barrier to the pleader." Taylor, 110 F.4th at 1028. In fact, the Supreme

7

Court recently reiterated this point in <u>Berk</u>: "By design, this system of pleading makes it relatively easy for plaintiffs to subject defendants to discovery—even for claims that are likely to fail." 146 S. Ct. at 553. The Court therefore admonished lower federal courts not to attempt "[t]o protect defendants from this burden" by "tr[ying] to require more information for certain kinds of claims," as the Court has "consistently rejected such efforts." <u>Id.</u> The Court thus concluded: "Unless the Federal Rules single out a claim for special treatment, see, *e.g.*, [Rule] 9, Rule 8 sets a ceiling on the information that plaintiffs can be required to provide about the merits of their claims." <u>Id.</u> at 553-54.

With these principles in mind, the court turns to each of the counts.

### <u>Count I</u>

In Count I, plaintiff alleges that defendants' unauthorized use of its IFS and INTERNAL FAMILY SYSTEMS trademarks constitutes unfair competition and trademark infringement under the Lanham Act. "The principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others." <u>B & B Hardware, Inc. v. Hargis Indus., Inc.</u>, 575 U.S. 138, 142 (2015). "One who first uses a distinct mark in commerce thus acquires rights to that mark," and "[t]hose rights include preventing others from using the mark." <u>Id.</u> To protect trademark owners, "Congress enacted the Lanham Act, the current federal trademark scheme." <u>Id.</u>

"[T]he Lanham Act creates at least two adjudicative mechanisms to help protect marks": (1) "a trademark owner can register its mark with the PTO"; and (2) "a mark owner can bring a suit for infringement in federal court." <u>Id.</u> "Registration is significant" because, among other things, it "is prima facie evidence of the validity of the registered mark . . ., of the owner's

ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the" registration. Id. at 142-43 (cleaned up). "The holder of a registered mark" also "has a civil action" under § 32 of the Lanham Act—later codified in § 1114 of Title 15—"against anyone employing an imitation of it in commerce when such use is likely to cause confusion, or to cause mistake, or to deceive." SportFuel, Inc. v. PepsiCo, Inc., 932 F.3d 589, 595 (7th Cir. 2019) (cleaned up).

Here, plaintiff has not alleged that it registered the IFS and INTERNAL FAMILY SYSTEMS marks; it alleges that it has "common law rights" in those marks. But even "[w]ithout federal registration," "an unregistered trademark can be enforced against would-be infringers in several ways." Matal v. Tam, 582 U.S. 218, 225 (2017). One of those ways is under § 43(a) of the Lanham Act—codified in § 1125(a) of Title 15—"which creates a federal cause of action for trademark infringement." Id. That is the section that plaintiff relies on in Count I: Plaintiff alleges that defendants' "unauthorized use in interstate commerce of [its] IFS and INTERNAL FAMILY SYSTEMS trademarks—including [its] common law rights—is likely to cause confusion . . . in violation of 15 U.S.C. § 1125(a)(1)(A)."

To prevail on a claim under § 1125(a)(1)(A), "a plaintiff must establish that (1) its mark is protectable and (2) the defendant's use of the mark is likely to cause confusion among consumers." SportFuel, 932 F.3d at 595 (citation omitted). Protectability focuses on whether the mark "specifically identifies and distinguishes one company's goods or services from those of its competitors." Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc., 149 F.3d 722, 726 (7th Cir. 1998). Likelihood of confusion focuses on whether consumers are likely to be confused "as to the source of th[e] specific goods or services." Id.

9

Defendants hinge their motions to dismiss on the first prong, arguing that plaintiff's INTERNAL FAMILY SYSTEMS and IFS marks are not protectable. "The first step in determining whether an unregistered mark or name is entitled to the protection of the trademark laws is to categorize the name according to the nature of the term itself." LHO Chicago River, L.L.C. v. Rosemoor Suites, L.L.C, No. 16 C 6863, 2017 WL 467687, at *7 (N.D. Ill. Feb. 3, 2017) (citation omitted). Because "the level of trademark protection available corresponds to the distinctiveness of the mark," "[m]arks are classified into five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful." Platinum Home, 149 F.3d at 727.

At the one end of the spectrum, "[a] generic term is one that is commonly used and does not identify any particular source." Id. Think "'Apple' apples," for example. Uncommon, LLC v. Spigen, Inc., 926 F.3d 409, 420 (7th Cir. 2019). Generic marks receive no trademark protection. Platinum Home, 149 F.3d at 727. At the other end, "[f]anciful ('Exxon' gasoline), arbitrary ('Apple' computers), and suggestive terms ('Tide' detergent) are inherently distinctive," Uncommon, 926 F.3d at 420, and are therefore "automatically entitled to trademark protection," Platinum Home, 149 F.3d at 727.

Falling somewhere in-between are descriptive marks. A descriptive mark "describes the ingredients, qualities, or characteristics of an article of trade or a service." Id. (citation omitted). Think "'Tasty' apples," for instance. Uncommon, 926 F.3d at 420. Descriptive marks are "a poor means of distinguishing one source of services from another," and so are "generally" not protectable. Platinum Home, 149 F.3d at 727 (cleaned up). But there is an "exception to this

10

general rule": "descriptive terms are protectable as a trademark if they have developed secondary meaning." SportFuel, 932 F.3d at 598 (cleaned up).

A descriptive term acquires a secondary meaning—or "acquired distinctiveness"—only "after most consumers think of the term as the name of the product instead of as descriptive of the product." Id. at 599. Or put another way, a "mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its products or services in that particular industry that the [mark] has come to mean that those products or services are the company's trademark." Platinum Home, 149 F.3d at 728 (citation omitted). In deciding whether a mark has acquired secondary meaning, courts may consider several factors, including: "(1) the amount and manner of advertising; (2) the sales volume; (3) the length and manner of use; (4) consumer testimony; and (5) consumer surveys." Id. (citation omitted).

Defendants argue that INTERNAL FAMILY SYSTEMS and IFS are descriptive. Plaintiff, they assert, "has pled itself out of court by admitting in the complaint that" both terms "describe a *type* of therapy that Schwartz originated over four decades ago." (Emphasis in original). The use of those terms, they contend, "describe only the *type* of therapy that is the subject of a course, training program or book." (Emphasis in original). As a result, defendants continue, the complaint needed—but failed—"to show that these terms have acquired secondary meaning." Indeed, they argue: the complaint does not address three of the five secondary-meaning factors; the "sales volume" allegations are "too cursory"; and the "length and manner of use" allegations aver that the terms referred to a type or model of therapy. Ultimately, defendants assert, plaintiff cannot meet its burden to show protectability, and cannot prevent them from "using 'IFS' to describe the IFS method of therapy, any more than Joseph Pilates,

11

who invented the 'Pilates' method of exercise . . . could prevent a person from opening an exercise studio and calling it a 'Pilates' studio, decades after Pilates coined that term." (Citing Pilates, Inc. v. Current Concepts, Inc., 120 F. Supp. 2d 286, 290-91, 306 (S.D.N.Y. 2000)).

Plaintiff argues in response that it is improper to consider a descriptiveness argument at the pleading stage, and even if it were not, defendants fail to explain how the marks "directly describe[ ] a characteristic, quality or feature of [p]laintiff's model." And even if it needed to plead secondary meaning, it has done so. Plaintiff thus concludes that the complaint "clearly alleges that [p]laintiff owns protectable trademarks," and that the motion to dismiss must be denied.

The court agrees with plaintiff. Simply stated, "[d]efendant[s] demand[ ] too much of [p]laintiff at this stage of the proceeding." Joshi v. Joshi, No. 18 C 5426, 2019 WL 3554388, at *5 (N.D. Ill. Aug. 1, 2019) (denying motion to dismiss trademark infringement claim). "The classification of a party's marks is a question of fact, and not appropriate for a summary judgment ruling—let alone a ruling on a motion to dismiss—unless the movant can demonstrate that the evidence as to the party's marks is so obvious that there is no doubt as to how the question of classification of the mark should be answered." Bhatia v. Vaswani, No. 18-CV-2387, 2021 WL 2254963, at *7 (N.D. Ill. June 3, 2021) (cleaned up) (denying motion to dismiss § 1125(a) claim); see also Platinum Home, 149 F.3d at 727 (the "determination that a trademark is either descriptive or suggestive is a finding of fact"). Defendants have not made that showing here.

Because "[t]he commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail," the mark "should be considered in its

12

entirety" when categorizing it. LHO, 2017 WL 467687, at *7 (cleaned up). "The line between descriptiveness and suggestiveness," moreover, "can be difficult to draw." Uncommon, 926 F.3d at 421. To help draw it, courts look to certain "markers," including the "imagination test": "If a mark imparts information directly it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." Id. at 422 (cleaned up).

Plaintiff's complaint pleads facts that plausibly support that the marks are at least suggestive. The complaint alleges that Schwartz "coined" INTERNAL FAMILY SYSTEMS and IFS to "identify" his specific psychotherapy model of "parts work," which "is the generic term for a form of psychotherapy based on the theory that individuals possess multiple internal parts or subpersonalities (or that it is helpful for individuals to view their own psyche in this way), and that engaging with these 'parts' can help patients address trauma and other psychological conditions." According to the complaint, "INTERNAL FAMILY SYSTEMS identifies the specific brand of psychotherapy and the specific training and certification programs developed." The court cannot definitively say at this stage that the marks refer to a characteristic of plaintiff's services, or that the marks do not require any imagination to connect them with the services, or even that the IFS mark is not arbitrary.

Nor does defendants' appeal to plaintiff's burden of proof or to cases finding other method-describing terms unprotectable help them here. True, because the marks are unregistered, plaintiff will ultimately bear the burden of proof to establish that they are entitled to protection. Platinum Home, 149 F.3d at 727. But evidentiary standards are not pleading standards. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002) (distinguishing between

13

a minimal pleading standard and the proof necessary to establish a claim). And as for defendants' cases, they were decided at later stages of litigation—after a bench trial and on summary judgment, with fully developed evidentiary records. See Pilates, 120 F. Supp. 2d at 296-306 (analyzing detailed evidentiary record from a bench trial before concluding that PILATES marks were generic); Suh v. Yang, 987 F. Supp. 783, 790-92 (N.D. Cal. 1997) (analyzing evidence on summary judgment, finding that the defendant had "set forth sufficient evidence to show that the term 'kuk sool,' is now understood by a 'substantial majority of the public' to refer to a type of martial arts, and is therefore generic"). In the end, defendants may be right that the marks are at most descriptive. But "the categorization of the [marks] cannot be resolved at this early stage of the case." Bhatia, 2021 WL 2254963, at *7.

Even if court could conclude at this point that the marks are descriptive, it still would not dismiss the claim. As with categorization, "whether a mark has acquired secondary meaning involves a fact-specific inquiry that is generally not appropriate to decide on a motion to dismiss." Joshi, 2019 WL 3554388, at *5. And the allegations plausibly support that the marks have acquired secondary meaning. The complaint alleges: that plaintiff exclusively offered training and certification services for decades; that plaintiff trained over 15,000 professionals on the IFS model and has "delivered introductory and educational programs on the IFS Model to tens of thousands more"; that plaintiff has strictly controlled certifications and credentials; and that plaintiff has achieved widespread third-party recognition (for example, being featured in a long-running New York Times Best Seller). "As a result of [p]laintiff's continuous and exclusive use of" the marks, the complaint thus concludes, "professionals . . . associate these marks exclusively with [p]laintiff." "In other words, the Complaint alleges that consumers have

14

a 'mental association' between the [marks] and [plaintiff], which is sufficient to plead secondary meaning."  Bhatia, 2021 WL 2254963, at *7.

The court denies defendants' motions to dismiss Count I.

### Count IV

Plaintiff alleges in Count IV that defendants' use of plaintiff's trademarks also constitutes unfair competition under Illinois common law.  "In Illinois, courts resolve unfair competition claims according to the principles set forth in the Lanham Act."  Id. at *6 (cleaned up).  So the court also denies defendants' motions to dismiss Count IV for the same above reasons.

### Count III

In Count III, plaintiff alleges that defendants' use of plaintiff's trademarks constitutes deceptive trade practices in violation of the UDTPA, 815 ILCS 510/1 et seq.  Defendants argue that this claim must be dismissed for two reasons.   First, defendants assert that a UDTPA claim based on improper trademark use rises and falls with a Lanham Act trademark claim, which they argue fails.   The court agrees with the underlying premise: "Illinois courts resolve [U]DTPA claims arising out of an alleged infringement of a mark under the same standard as the Lanham Act."  Specht v. Google, Inc., 660 F. Supp. 2d 858, 866 (N.D. Ill. 2009).   But that sinks defendants' argument for dismissal because the Lanham Act trademark claim has survived.

Second, defendants contend that the UDTPA claim also fails because "there is nothing in the complaint to suggest that [plaintiff]'s UDTPA claim is based on conduct that occurred primarily and substantially in Illinois."   The court disagrees.

"Courts have interpreted the IUDTPA to require the dispute occur primarily and substantially in Illinois."  BCBSM, Inc. v. Walgreen Co., 512 F. Supp. 3d 837, 856 (N.D. Ill.

15

2021). To determine whether a dispute occurred "primarily and substantially" in Illinois, courts consider many factors, including: "(1) the plaintiff's residence, (2) where the misrepresentation was made, (3) where the damage to the plaintiff occurred, and (4) whether the plaintiff communicated with the defendant in Illinois." Specht, 660 F. Supp. 2d at 866. This "is a fact-intensive question." BCBSM, 512 F. Supp. 3d at 857.

Plaintiff has pleaded enough facts here to plausibly provide a "factual nexus with Illinois." Specht, 660 F. Supp. 2d at 866 (denying motion to dismiss UDTPA claim). The complaint alleges that plaintiff is an Illinois corporation with a principal place of business in Illinois. It is reasonable, then, to infer that plaintiff "suffered any damage from the alleged infringement in Illinois." Id. The complaint further alleges that three of the defendants operate websites that "target residents of Illinois by offering courses and/or certification programs to residents of" Illinois; that PESI claims to be registered with the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation; that Evergreen listed 58 professionals in the state of Illinois who hold certifications issued by Evergreen Certifications; and that Anderson provides training sessions and seminars nationwide, including to residents of Illinois.

These allegations are sufficient to avoid dismissal. Compare Specht, 660 F. Supp. 2d at 866 (denying motion to dismiss UDTPA claim where the plaintiff resided in Illinois, defendant Google was registered to do business in Illinois, and the "alleged infringement took place on the Internet and was international in scope, presumably occurring in Illinois"); with BCBSM, 512 F. Supp. 3d at 857 (granting motion to dismiss UDTPA claim even though the court was "hesitant to dismiss without discovery," because "[t]he only alleged facts that tie the claim to Illinois are

16

that [defendants] are headquartered here and have 583 drugstores in the state of Illinois"). The court therefore denies defendants' motions to dismiss Count III.

## Count II

In Count II, plaintiff alleges a claim for false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). "To establish a deceptive advertising claim under § 1125(a)(1) of the Lanham Act, a plaintiff must show that (1) the defendant made a material false statement of fact in a commercial advertisement; (2) the false statement actually deceived or had the tendency to deceive a substantial segment of its audience; and (3) the plaintiff has been or is likely to be injured as a result of the false statement." Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n, 922 F.3d 827, 833 (7th Cir. 2019) (Cleaned up).

Defendants argue that plaintiff's false advertising claim must be dismissed. They first contend that the claim is subject to the heightened pleading standards under Rule 9(b) because plaintiff alleges fraudulent conduct. Plaintiff counters in response that even though the complaint "does use the word 'fraudulent' (three times)," Rule 9(b) does not apply because plaintiff's "false advertising claims here do not sound in fraud and they are not based upon a course of fraudulent conduct."

"A majority of judges in this circuit who have considered the question have concluded that Rule 9(b) does generally apply to [claims of false advertising under the Lanham Act]." Vertical Web Media, L.L.C. v. Etailinsights, Inc., No. 14 C 3220, 2014 WL 2868789, at *3

17

(N.D. Ill. June 24, 2014). The court will assume for purposes of the motions that Rule 9(b)'s particularity standard applies here.

Rule 9(b) ordinarily requires a plaintiff to describe the "'who, what, when, where, and how' of the fraud—the first paragraph of any newspaper story." Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co., 631 F.3d 436, 441-42 (7th Cir. 2011) (cleaned up). Such detail "is required in part because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled." Id. at 442. But the precise level of detail that must be "included in that first paragraph . . . may vary on the facts of a given case." Id.

Plaintiff's allegations provide sufficient detail of the first paragraph of a newspaper story under the facts of this case. Plaintiff alleges that "[o]n April 16, 2025, Dr. Anderson . . . informed [p]laintiff that he would no longer conduct training programs on behalf of [p]laintiff." Yet, plaintiff alleges, "Anderson and PESI continued to market Dr. Anderson and his programs, including the unauthorized Certified IFS Trauma Clinician (IFST-C) certification, by falsely stating that he '*is a Lead Trainer at the IFS Institute under Richard Schwartz*,' continuing to intentionally mislead and confuse consumers as to PESI and Anderson's affiliation with Plaintiff." (Emphasis in complaint). This false statement, plaintiff avers, was on "PESI's website." Plaintiff has thus provided: the "who" (PESI and Anderson); the "what" (Anderson "is" a Lead Trainer under Schwartz); the "when" (after April 2025); and the "where" and "how" (on PESI's website). This is sufficient under the circumstances here. See Vanzant v. Hill's Pet Nutrition, Inc., 934 F.3d 730, 739 (7th Cir. 2019) (finding similarly detailed allegations provided

18

the "who," "what," "when," "where," and "how" with particularity, and "plead[ed] a deceptive-practices claim to the degree of particularity required by Rule 9(b)").

The complaint further alleges that in "June of 2025, Evergreen . . . publicly announced the launch of a new certification program," that Evergreen's "website identifies Dr. Anderson as an 'Advisor' to the certification program," and that "[a]t the time it was launched, the website falsely claimed: 'Dr. Anderson is the Vice Chair, Director, and trainer for the Center for Self Leadership with Richard Schwartz, PhD.'"   According to the complaint, this false statement "confuses the public and falsely associates this fake certification with the goodwill and integrity of [p]laintiff's business and brand."   The complaint also alleges that on Evergreen's website, "Anderson and others describe themselves as Lead Trainers at IFS Institute, IFS Approved Clinical Consultants, IFS Certified Therapists, and IFS Level 1, 2, or 3 Trained."   Plaintiff therefore provides: the "who" (Evergreen and Anderson); the "what" (Anderson "is" the Vice Chair, Director, and trainer with Schwartz and describes himself as still being affiliated with plaintiff); the "when" (in or after June 2025); and the "where" and "how" (on Evergreen's website).   This is sufficient under the circumstances here.[1]

Defendants press that the alleged false statements are not actionable because they do not misrepresent the "nature, characteristics, qualities, or geographic origin" of any goods or services.   (Quoting 15 U.S.C. § 1125(a)(1)(B)).   The court disagrees.   By allegedly making

---

[1]   Evergreen argues that "the allegations about 'others' who describe themselves as having various 'IFS'-related credentials are not pled with particularity under Rule 9(b)."   The court agrees, and disregards that part of the allegation.   See Sava v. 21St Century Spirits, LLC, No. 22 C 6083, 2024 WL 3161625, at *6 (N.D. Ill. June 25, 2024) (explaining that "when an allegation comes up short" under Rule 9(b), "the court simply disregards the allegation and does not automatically dismiss the claim" (emphasis omitted)).

false statements about Anderson's current affiliation with Schwartz and plaintiff, defendants are plausibly misrepresenting the nature of the training and certification programs that they sell.

Defendants also argue that plaintiff has not plausibly alleged that Anderson saying that he "is" a Lead Trainer versus that he "was" a Lead Trainer, or that Anderson's credentials as an Advisor on Evergreen's website, are material. The court again disagrees. "A materially false statement is one that is likely to influence a consumer's purchasing decision." At World Props., LLC v. Baird & Warner Real Est., Inc., No. 18-CV-01973, 2019 WL 4034636, at *6 (N.D. Ill. Aug. 27, 2019) (cleaned up). It is reasonable to infer from the allegations that the value of a training or certification program is affected by the individuals affiliated with it, and thus, that a potential customer would be more likely to pay for a training or certification program if they believe that the program is affiliated with individuals having particular credentials. Plaintiff's allegations are thus sufficient at this stage. Indeed, "[d]enying dismissal on materiality grounds is particularly appropriate since materiality is generally an issue of fact." Id.

Finally, defendants rely heavily on RBG Plastics, LLC v. Sparkles Gift & Party Shop, Inc., No. 1:24-CV-02155, 2025 WL 2764505 (N.D. Ill. Sept. 29, 2025). But that reliance is misplaced: The false advertising claim there was nothing like the claim here. The RBG plaintiff alleged that the defendants used the phrase "RESTAURANTWARE" as a category name for their products "by including a link in advertising that says: 'Browse our Restaurantware' . . . ." Id. at *6. Unlike plaintiff here, the plaintiff there did not "claim[ ] that [the] Defendants [we]re asserting something false about their product." Id. So it was not difficult to conclude there that the plaintiff had not plausibly pleaded a false statement—let alone a material one—about the nature or qualities of any goods. Id. RBG thus provides no support for defendants.

20

The court denies defendants' motions to dismiss Count II.

## Count VI

Plaintiff asserts in Count VI that PESI breached the PESI Contract with plaintiff. According to the complaint, the PESI Contract is "a valid and enforceable contract for the purpose of . . . hosting . . . and promoting [p]laintiff's online programming on the PESI platform while sharing profits." Plaintiff further alleges that the PESI Contract includes a provision that "provides that '[n]ew online content that needs to be developed for current or future online programming may be developed by [plaintiff] or in partnership with PESI,'" and PESI breached this provision by "developing and hosting new online content using the IFS and INTERNAL FAMILY SYSTEMS trademarks on its own."

In moving to dismiss, PESI attaches the PESI Contract to its motion and argues that plaintiff's claim fails under either Illinois (plaintiff's location) or Wisconsin (PESI's location) law because, under both, "a breach of contract claim requires an identifiable breach of a contract term," (cleaned up), and plaintiff "identifies no such breach" here. In response, plaintiff does not challenge PESI's reliance on the attached contract, or dispute that Illinois and Wisconsin law both require plaintiff to identify a contract term that was breached.

Because neither party contends that there is a difference between Illinois and Wisconsin law on this issue, the court need not perform a choice-of-law analysis. See Johnson v. Uber Techs., Inc., No. 16 C 5468, 2017 WL 1155384, at *1 (N.D. Ill. Mar. 13, 2017) (when "the parties do not contend there is a difference between two states' laws, a court need not perform a choice-of-law analysis"). Under Illinois and Wisconsin law, to establish a breach of contract claim, a plaintiff must show the existence of a valid and enforceable contract which the

21

defendant breached and thereby caused damage. See Reger Dev., LLC v. Nat'l City Bank, 592 F.3d 759, 764 (7th Cir. 2010) (listing elements for breach of contract under Illinois law); Matthews v. Wis. Energy Corp., 534 F.3d 547, 553 (7th Cir. 2008) (listing elements for breach of contract under Wisconsin law).

In evaluating PESI's motion to dismiss, "the court must construe the allegations in the Complaint, along with the agreement attached to the Complaint, in the light most favorable to plaintiff." Young v. Associated Bank Nat'l Ass'n, No. 24 C 8911, 2025 WL 1282747, at *5 (N.D. Ill. May 3, 2025) (cleaned up).[2] But plaintiff's claim "may be resolved in a motion to dismiss if it is barred by the unambiguous terms of the contract, as the interpretation of an unambiguous contract is a matter of law for the Court." Id. (cleaned up); Guitar Ctr. Stores, Inc. v. 7250 S. Cicero Equities, LLC, No. 07 C 4227, 2007 WL 3374592, at *3 (N.D.Ill. Nov. 8, 2007) ("At a minimum, there must at least be some ambiguity in the language of the contract before determining that its meaning cannot be resolved on a motion to dismiss."). Or otherwise stated, "[t]he unambiguous contract controls over contrary allegations in the plaintiff's complaint." McWane, Inc. v. Crow Chicago Indus., Inc., 224 F.3d 582, 584 (7th Cir. 2000). Thus, if the contract unambiguously shows that PESI had no duty to perform as plaintiff has alleged, the court should dismiss the claim. See id. (affirming dismissal of breach of contract claim where the agreement unambiguously showed that defendant owed no duty to conduct a due

---

[2] Here, the contract was not attached to the complaint but to PESI's motion. The court may still consider it. A defendant may rely on external documents in support of a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to his claim." Mueller v. Apple Leisure Corp., 880 F.3d 890, 895 (7th Cir. 2018). "This rule is a liberal one—especially where, as here, the plaintiff does not contest the validity or authenticity of the extraneous materials." Id. Because the PESI Contract is central to plaintiff's claim and plaintiff does not challenge its authenticity, the court relies on it here.

diligence investigation).

PESI argues that this is precisely the case here. According PESI, the contract does not require PESI to "produce" anything; it requires that PESI host and promote plaintiff's IFS Online Circle and IFS Continuity programs—and any new content that plaintiff "may" develop in the future—on PESI's platform. Plaintiff, PESI asserts: does not allege that PESI breached its obligations as to the "IFS Online Circle" and "IFS Continuity" programs; does not allege that plaintiff developed new online content, which PESI failed to host; and "points to nothing" in the contract that stops PESI from developing programming on its own or with others. Thus, PESI concludes, "there is no plausible reading of the PESI Contract that supports an actual breach."

In response, plaintiff contends that: the plain language of the contract "makes clear [that] the parties intended PESI to host Plaintiff's CSL content and that PESI will only create [plaintiff's] content with [p]laintiff, *if at all*," (emphasis by plaintiff); "[t]here was no provision allowing PESI to create its own [plaintiff] content"; and PESI breached the contract when it created its own content using plaintiff's marks. Plaintiff therefore asserts that it "adequately alleged a claim for breach of contract."

Here, then, both parties agree that the language is unambiguous. But both cannot be right about its meaning. The court agrees with PESI that the contract unambiguously shows that PESI owed no duty to refrain from developing its own "IFC" programming. The contract

23

provides in relevant part (the complaint relies on the second bullet point, in particular):

> This proposal dated March 1st, 2018 is issued to The Center for Self Leadership (here within referred to as CSL) and PESI, Inc. CSL is contracting with PESI to maintain, host and promote CSL online programming, including, but not limited to: IFS Online Circle, and IFS Continuity Program. This proposal also concerns PESI managing, maintaining, hosting and promoting prior mentioned online programs and future online programs on PESI's native platform. The intent of this agreement is to begin partnership as of June 1, 2019 which includes building of the content and portal setup, the full marketing promotion of content to begin fall of 2019.
>
> Content:
> - PESI has the rights to use existing CSL content for purposes of online program builds and marketing efforts. Existing online content that has been developed by CSL for purposes of online programs includes, but is not limited to: in-session video/audio content, video/audio lecture sessions, video/audio interview content, handouts, worksheets. PESI agrees to inform and consult with CSL for any use of existing CSL content.
> - New online content that needs to be developed for current or future online programming may be developed by CSL or in partnership with PESI. PESI can assist with video and audio production needs.

These provisions are all about creation of plaintiff's content for plaintiff's programming that PESI is hosting. The contract begins by explaining that "CLS is contracting with PESI to maintain, host and promote CSL online programming"—including "future online programs"— "on PESI's native platform." And the "intent of th[e] agreement," the contract continues, "is to begin partnership . . . which includes building of the content and portal setup . . . ." The contract then explains that PESI will have "the rights to use existing CSL content" and will "agree[ ] to inform and consult with CSL for any use of existing CSL content." And it then states that "[n]ew online content that needs to be developed for current or future online programming may be developed by CSL or in partnership with PESI," and that "PESI can assist with video and audio production needs."

Read in the context of the agreement, the "new online content" provision has nothing to do with mandatory exclusivity. It instead uses permissive "may" language that appears designed to protect plaintiff's ability to use other entities—instead of PESI—to create its content, ensuring that plaintiff is not locked in to using PESI's services. In any event, what ultimately

24

matters here is that the contract says nothing about plaintiff's trademarks or PESI developing and hosting its <u>own</u> content for separate programming.   So plaintiff is asking the court to read into the contract a negative covenant by implication.

The court declines the invitation.   "When interpreting a contract, [the court] cannot read terms into the language that are not expressly stated."   <u>GNB Battery Techs., Inc. v. Gould, Inc.</u>, 65 F.3d 615, 622 (7th Cir. 1995).   And "implied covenants should not be introduced into contracts unless absolutely necessary to effectuate the intention of the parties."   <u>Kenall Mfg. Co. v. Cooper Lighting, LLC</u>, 723 F. Supp. 3d 640, 650 (N.D. Ill. 2024) (cleaned up), on reconsideration in part, No. 17 CV 4575, 2024 WL 3275396 (N.D. Ill. July 2, 2024).   Plaintiff has not attempted to show that the negative covenant it seeks is absolutely necessary to effectuate the intent of the parties.   Nor could it: the "possibility of a [trademark] infringement suit to protect" plaintiff's rights "negates any inference that the implication of such a covenant is 'absolutely necessary' to the effectuation of the parties' intentions."   <u>Id.</u> (citation omitted).

The court dismisses Count VI with prejudice.

## Count V

Plaintiff asserts in Count V that Anderson breached his fiduciary duty to plaintiff.   To establish a breach of fiduciary duty claim under Illinois law, a plaintiff must show: "(1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages proximately resulting

25

from the breach." Cement-Lock v. Gas Tech. Inst., No. 05 C 0018, 2005 WL 2420374, at *16 (N.D. Ill. Sept. 30, 2005).[3]

Plaintiff alleges here that the "2020 Anderson Contract placed Dr. Anderson in a position of trust within [p]laintiff's organization," "tasked him with protecting the integrity of [p]laintiff's brand and trademarks," and "required him to represent [p]laintiff's interests in negotiations with PESI." Anderson therefore "served as agent and owed [p]laintiff fiduciary duties, including duties of loyalty, confidentiality, and care." But, plaintiff alleges, Anderson breached his fiduciary duties by "misappropriating the very trademarks he was entrusted to protect," and by "us[ing] confidential information obtained while representing [p]laintiff in negotiations with PESI." "In doing so," plaintiff avers, he "exploited his position and the trust [p]laintiff placed in him . . . for his own benefit," causing "damages, including loss of goodwill."

In moving to dismiss, Anderson argues that Rule 9(b) applies because misappropriating trademarks and misusing confidential information are "fraudulent acts," and because plaintiff's opposition states that defendants worked in concert "to create a knockoff version of [CSL's] program that used [CSL's] trademarks and false and misleading advertising to encourage therapists to seek training and certification from [d]efendants rather than [CSL] . . . in breach of [unspecified] fiduciary and contractual obligations." (Brackets by Anderson).

The court is not convinced. "Rule 9(b) is strictly construed; it applies to fraud and mistake and nothing else." Cement-Lock, 2005 WL 2420374, at *17 (citation omitted). A claim "sounds in fraud" if it "is premised upon a course of fraudulent conduct." Borsellino v.

---

3 Anderson argues that Illinois law applies. Plaintiff does not dispute this, and it also relies on Illinois law. The court thus assumes for purposes of this motion that Illinois law applies.

Goldman Sachs Grp., Inc., 477 F.3d 502, 507 (7th Cir. 2007). To be sure, the complaint uses the term "fraudulent" a few times, and plaintiff alleges false or misleading advertising (which is discussed above). But the Count V breach of fiduciary duty claim is not premised on those or any other allegations of fraudulent conduct. Plaintiff is not, for example, alleging that Anderson breached his fiduciary duty by knowingly misleading plaintiff. See Cornielsen v. Infinium Cap. Mgmt., LLC, 916 F.3d 589, 604 (7th Cir. 2019) ("Both claims [of breach of fiduciary duty and fraud] are subject to Rule 9(b)'s heightened pleading requirements, as they are premised on allegations that the defendants knowingly misled Plaintiffs.").

The fiduciary claim is instead premised on misappropriating trademarks and misusing confidential information. And these are not (at least in this case) "fraudulent acts," as Anderson contends. See Cement-Lock, 2005 WL 2420374, at *17 (declining to apply Rule 9(b) to breach of fiduciary duty claim that alleged breaches "based on [the defendants'] alleged self-dealing, non-arm's-length deals, and misappropriation of Cement-Lock Group's monetary and intellectual property"). The court thus finds that Rule 9(b) does not apply here.

That leaves Rule 8's pleading standards. Anderson argues that plaintiff cannot meet those standards either because it "has not plausibly alleged that [he] breached any fiduciary duty that he owed to [plaintiff]." As for the breach-by-misappropriating-trademarks allegation, Anderson argues that this "is just a repackaged trademark infringement claim that fails for the reasons discussed above in Section II." But as already discussed, plaintiff's trademark infringement claim does not fail. So the court will not dismiss the claim on this basis.

Anderson also argues that there is no "basis on which to turn the alleged misappropriation of a supposedly 40-year-old mark into a breach of fiduciary duty claim." (Citing Life After

27

Hate, Inc. v. Free Radicals Project, Inc., No. 18-cv-6967, 2019 WL 2644237, at *9 (N.D. Ill. June 27, 2019)).   But Life After Hate does not support that assertion.   The court there merely noted that the plaintiff had not "cited any cases to support his contention that the individuals' use of his trademarks . . . created a legal fiduciary duty."   Life After Hate, 2019 WL 2644237, at *9 (emphasis added).   Plaintiff does not allege here that Anderson's use of its trademarks created the duty; it alleges that Anderson's (mis)use of its trademarks violated an already-existing duty. Courts have allowed similar claims to proceed.   See Cement-Lock, 2005 WL 2420374, at *17.

As for the second alleged breach—that Anderson used confidential information obtained while representing plaintiff in negotiations with PESI—Anderson argues that it is not pleaded with particularity.   But again, Rule 9(b) does not apply.   And plaintiff pleads enough under Rule 8: Plaintiff alleges that plaintiff "entrusted" Anderson "with confidential, privileged legal strategy, documents, and communications pertaining to [p]laintiff's trademark protections," and that Anderson then used this and other confidential information obtained from plaintiff in negotiations with PESI to collaborate with PESI on a competing program.

Lastly, Anderson argues in a single-sentence footnote in his opening brief and in his reply brief that nothing in the 2020 Anderson Contract would cause Anderson to owe fiduciary duties to plaintiff.   And he argues for the first time in reply in a single sentence that, "[e]ven if it did, the contract ended in December 2020 – long before Anderson allegedly launched a competing program with PESI in 2025."   These arguments fail.

First, "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."   United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir. 1991).   Second, arguments raised for the first time in a reply brief are waived.   White v. United

28

States, 8 F.4th 547, 552-53 (7th Cir. 2021). And third, Anderson fails to show that nothing in the 2020 Anderson Contract would cause Anderson to owe fiduciary duties. The 2020 Anderson Contract provides that Anderson will "agree[ ] to represent [plaintiff]'s interests in all negotiations with PESI," to "assist[ ] in the development of IFS Approved Mark qualifications and other quality control/IFS integrity structural creation and maintenance," and to "not duplicate similar service[s] . . . for IFSI 'competitors' without mutual agreement between" plaintiff and Anderson.[4] The complaint further alleges that Anderson then served as plaintiff's agent, and that the parties continued to operate under the "contract through 2021, into 2022 and beyond."

The court denies Anderson's motion to dismiss Count V.

### All Claims Against Anderson, Inc.

Finally, Anderson, Inc. argues that all counts asserted against it should be dismissed because the complaint fails to plausibly plead any claims against it. According to Anderson, Inc., plaintiff mentions Anderson, Inc. "only 5 *times* across 4 paragraphs" of a 131-paragraph complaint. (Emphasis in original). Because there are no "specific allegation[s] that the Company is responsible for the acts about which [plaintiff] complains," Anderson, Inc. concludes, the claims against it should be dismissed.

Plaintiff argues in response that it has alleged enough. According to plaintiff, it alleges that Anderson, Inc. is "owned and operated" by Anderson, that "Anderson provides [the infringing training sessions] both in his personal capacity and via his company," that PESI and

---

[4] The court may consider the 2020 Anderson Contract here because it referred to in the complaint and is central to the claim, and plaintiff does not contest its authenticity. Mueller, 880 F.3d at 895.

29

Anderson "worked together to create an infringing program," and that "PESI reported more than $600,000 in payments to" Anderson, Inc. "during the time that the program was likely being developed." In the context of the full complaint, plaintiff argues, "[t]his creates a more than plausible inference that Anderson Inc. was actively involved in the creation of the infringing programs and false advertisements along with Dr. Anderson."

The court disagrees. "Liability is personal." Bank of Am., N.A. v. Knight, 725 F.3d 815, 818 (7th Cir. 2013). And "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful." Id. Here, the complaint lays out in detail—over a span of more than 60 paragraphs (¶¶ 38-103)—Anderson's, PESI's, and Evergreen's various "INFRINGING ACTIVITES." Yet there is no mention of Anderson, Inc.'s activities. So unlike with the other defendants, plaintiff has not sufficiently pleaded what it alleges Anderson, Inc. did that was legally wrongful.

Nor are the sparse allegations elsewhere in the complaint—that Anderson, Inc. received payments from PESI, and that, "on information and belief," Anderson "provides . . . training sessions both in his personal capacity and via" Anderson, Inc.—enough to move plaintiff's assertion that Anderson, Inc. is legally liable from "conceivable" to "plausible." Taylor, 110 F.4th at 1028. Stated in the words of Iqbal: Because the "pleaded facts do not permit the court to infer more than the possibility of misconduct" against Anderson, Inc., "the complaint has alleged—but it has not shown—that the pleader is entitled to relief" against Anderson, Inc. 556

30

U.S. at 679 (cleaned up). The court thus dismisses the claims against Anderson, Inc. without prejudice.

**CONCLUSION**

For the above reasons, the court grants in part and denies in part defendants PESI and Evergreen's motion to dismiss [23] and defendants Anderson and Anderson, Inc.'s motion to dismiss [26]. The court grants the Andersons' motion to dismiss all claims against Anderson, Inc. without prejudice. The court also grants PESI and Evergreen's motion to dismiss Count VI against PESI with prejudice. The court otherwise denies both motions. The remaining defendants are directed to file their answers by April 30, 2026. The parties are directed to file a joint status report using this court's form on or before May 7, 2026.

So ordered.

ENTER:

Robert W. Gettleman
United States District Judge

DATE:    April 9, 2026

31